450 So.2d 1292 (1984)
ENVIRONMENTAL CONTROL COMMISSION
v.
BROWNING-FERRIS INDUSTRIES, CHEMICAL SERVICES, INCORPORATED.
No. 83-C-2654.
Supreme Court of Louisiana.
April 2, 1984.
Rehearing Denied May 3, 1984.
*1294 Herschel L. Abbott, Jr., Harry S. Hardin, III, Samuel O. Buckley, III, Michael A. Chernekoff, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for applicant.
William J. Guste, Jr., Atty. Gen., Peter M. Arnow, John B. Sheppard, Jr., Gary L. Keyser, Asst. Attys. Gen., Counsel for respondent.
Leonard Knapp, Dist. Atty., amicus curiae.
DIXON, Chief Justice.
Browning-Ferris Industries, Chemical Services, Inc. (hereinafter "BFI"), defendant, owns and operates a hazardous waste treatment, storage and disposal facility near Willow Springs in Calcasieu Parish. On the facility, BFI has secure landfill cells into which BFI deposits solid wastes. The Environmental Control Commission conducted extensive public hearings concerning the possible effects the facility had on the environment and on the health of nearby residents. At the conclusion of the hearings, the commission issued an order, which it styled "Compliance Order and Schedule for Closure." In the order the commission ordered BFI, in regard to its landfill operations, to "cease the receipt of all hazardous materials by December 31, 1983." BFI appealed the closure order. The court of appeal affirmed the order on December 28, 1983. Environmental Control Commission v. Browning-Ferris Industries, Chemical Services, Inc., 446 So.2d 755 (La.App.1983). On the application of BFI, this court stayed the execution of the closure order, 444 So.2d 1213, and, on January 18, 1984, granted BFI's writ *1295 application. 447 So.2d 1064. The judgment of the court of appeal is reversed, and ¶ X of the order of the commission of May 12, 1983 is vacated.
Beginning in 1968, the former owner of the Willow Springs site began accepting waste oils and petrochemical refinery wastes for storage. These liquid wastes were stored in surface lagoons which had been created by building eight feet high ring levees. In 1972 BFI acquired the site, as well as some contiguous land, all of which comprises the present eighty acre site. BFI converted an abandoned, on-site oil well into a deep injection disposal well. The well was permitted by the Department of Conservation in 1976, at which time BFI voluntarily began a dewatering operation to remove the liquids from the existing lagoons. The sludges and oils that remained were solidified by mixing them with kiln dust, and the resulting products either were stored in place and capped with clay, or transferred to new secure landfill cells.[1] This landfilling operation was permitted by the Louisiana Department of Health and Human Resources in 1977.
In 1979 the legislature, finding that "[t]he maintenance of a healthful and safe environment for the people of Louisiana is a matter of critical state concern," R.S. 30:1052(A)(1), enacted the comprehensive Louisiana Environmental Affairs Act. La. Acts 1979, No. 449; R.S. 30:1051-:1147, and consolidated the state's environmental control program in the newly created Office of Environmental Affairs and the Environmental Control Commission, both created within the Department of Natural Resources. The statute defined the powers of these agencies, as well as the procedures needed to implement those powers. Substantively, the act was subdivided into several parts, each of which controlled a special area of environmental concern: Air Control Law, Water Control Law, Nuclear and Radiation Control Law, Solid Waste Management and Resource Recovery Law, Hazardous Waste Control Law, and the creation of the Louisiana Resource Recovery and Development Authority.
By special provision of the Hazardous Waste Control Law, BFI was allowed to continue, and is presently continuing, its operations pursuant to its pre-existing permits. R.S. 30:1146; Order of the Environmental Control Commission, Finding of Fact I (November 16, 1982). Following § 1137 of Title 30 and the existing regulations, (Hazardous Waste Management Plan, Rules and Regulations (1979) ["HWMP"], Rule 5.3.1(A)), BFI filed notice of its operations, and submitted an application for a new permit in February, 1980, which application BFI supplemented in May, 1980. In July, 1980, the Department of Natural Resources requested additional information. BFI responded, and also included an amendment to its application, requesting permission to expand its operations to contiguous lands. On December 30, 1980 the commission issued a "Compliance Schedule and Performance Guidelines," which ordered BFI to resubmit its application in light of the state's receipt of Phase I authority under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq., and further to comply with the new standards promulgated by the commission in light of that new status. BFI complied with the order. The commission, at the request of a Calcasieu Parish citizens' group, postponed any further hearings on the BFI permit application, pending the completion of a report on hazardous wastes in the parish, to be prepared by the group.
No further action was taken on the application for the permit, and BFI continued its *1296 operations at the site. Late in 1982, BFI's monitoring program detected some possible contamination of the soils and shallow waters under the site. BFI reported this contamination to the Office of Environmental Affairs. In response to this notice, the commission convened a public hearing on the matter, in November, 1982. After the meeting, the commission issued an order which compelled BFI to conduct further testing of the site and surrounding area. Pursuant to the November order, BFI hired an independent consultant to conduct these tests. In February, 1983 BFI, after reassessing its needs, notified the office that it withdrew its application to expand its facilities, and that it would cease its landfilling operations on the site when the final secure landfill cell was completed and filled, estimated to be within two years.
In March, 1983 the commission reconvened the public hearings on the reported contamination.[2] The hearings were conducted without strict adherence to any formalities. The order of the presentations each day was determined by the convenience of some of the participants. No burden of proof ever was established, no witnesses were sworn, no formal discovery techniques were used, and no rules of evidence were followed. Members of the audience and public officeholders were allowed to make their speeches and to question members of the commission.
However informal the proceedings, the seriousness of the matter could not be questioned. The commission, BFI and the citizens' group presented their expert witnesses and detailed, highly technical reports. Exhaustive examination was made of the witnesses and other evidence. During the course of the meetings, testing on the BFI site continued, all the parties hoping that concrete evidence could be found to prove one side's position or the other.
At the conclusion of these public hearings, on May 12, 1983, the commission voted and issued an order to BFI. It ordered, among other things, that BFI continue monitoring its site, and that BFI would "cease the receipt of all hazardous materials by December 31, 1983 for landfill cells and immediately initiate the closure of all such cells in accordance with plans submitted and approved by the commission in accordance with item XI," Compliance Order and Schedule for Closure ¶ X (May 12, 1983). (Emphasis in original). Paragraph XII of the same order decreed that "Cells # 7 and # 8 shall be constructed ..." While BFI was ordered to close all cells in ¶ X, they were ordered to construct Cells # 7 and # 8 in ¶ XII.
BFI gave notice of an appeal from the order. In its assignments of error, BFI contended that the commission erroneously found that BFI had withdrawn its application for a waste disposal/treatment/storage permit; that the commission violated both constitutional and statutory procedural requirements by ordering the closure of the facility; and that the setting of the closure date was done in an arbitrary and capricious manner in that the action was not supported by the evidence in the record.
The court of appeal affirmed the order of the commission. In its holding the court found that BFI was not entitled to the procedural formalities required of a permit revocation since, upon the issuance of the December 30, 1980 schedule of compliance, BFI was not operating under a permit at all. The commission's informal actions, therefore, were appropriate, in that they constituted mere amendments of the original compliance order. Since the court's opinion was rendered just three days prior to the effective date of the closure order, BFI sought a stay order from this court. *1297 Upon showing a substantial likelihood of prevailing in its application to this court, a stay order was granted, preventing the commission from enforcing the closure provision of its order. Shortly thereafter BFI's writ application was completed, and granted. An expedited hearing was granted on the matter. Before this court, BFI again raised the procedural challenges to the closure order.
The Environmental Control Commission is the enforcement arm of the Department of Natural Resources in matters dealing with the environment. It is the commission's function to establish rules and regulations which set standards for hazardous waste handling, R.S. 30:1136(A)(1), to rule on hazardous waste handling permits, and to ensure that the statutory and regulatory standards are met. It can accomplish this policing of the standards through several devices. The commission, upon finding a violation of the statute, rules and regulations, or permits or other orders, may issue compliance orders, R.S. 30:1073(C)(2)-(3); the commission, upon the promulgation of new regulations or statutory standards, or changes in circumstances which make special rules applicable, may issue compliance schedules which order operators to meet the new standards within specified times, R.S. 30:1136(A)(4); the commission, upon finding violations of such a magnitude that they pose serious and imminent threats to the environment or the health and safety of the citizens, may issue temporary, emergency cease and desist orders, R.S. 30:1073(C)(1); and the commission, upon finding a violation, may institute civil proceedings for penalties, R.S. 30:1073(B), (C)(2)-(3). Additionally, the commission may report criminal violations to the district attorney who shall institute criminal proceedings against the violator, R.S. 30:1073(F).
It is helpful to determine first what the commission sought to accomplish through its series of public hearings. The notice for the March-May hearings stated that the commission would hold a meeting "to consider the issuance of a compliance order for closure and cleanup of the landfill at the Browning-Ferris Industries' Willow Springs, Louisiana facility and any other compliance orders that may be necessary or appropriate for that facility." However, on the last day of the hearings it still was not settled whether the commission could close the facility. "We're not discussing closure at this time, we're discussing when to come up with a remedial action plan...." Remarks of Comm'r George Cramer, Transcript, Proceedings of the Environmental Control Commission, Vol. 11, at 17 (May 12, 1983). ["Transcript"].
The commission could not issue a cease and desist order, since it was unable to find a violation which "is occurring or is about to occur which violation is of such a magnitude as to require immediate action to prevent irreparable damage to the environment, or ... [that there is] a serious threat to life or safety based on recognized criteria or standards...." R.S. 30:1073(C)(1). See generally Transcript, Vol. 11, at 32-36 (May 12, 1983). Neither could the commission issue an enforcement compliance order under, § 1073(C)(2)-(3), because there was no cited violation before the commission.
"We don't now have an allegation of a violation that the Commission can rule on right now today. The Commission would have to go into an adjudicatory hearing, set an adjudicatory hearing for a violation, hear the evidence and determine what action should be taken. The monitoring wells which will be placed might give additional evidence of a violation, but a violation is not before us today, because we have to go through, and I know you hate to hear this, but we have to go through the procedures of alleging the violation, they get to answer it, they present evidence, other evidence is presented, then the Commission decides." Remarks of Chairman Winston Day, Transcript, Vol. 11, at 31-32 (May 12, 1983).
District Attorney Knapp, of Calcasieu Parish, agreed that a violation was not properly before the commission at the March-May hearings. Since there was no allegation or finding of a violation, the commission *1298 could not properly issue a compliance order, under § 1073, since those orders are limited, by the terms of the statute, as enforcement devices to correct violations. Similarly, the commission could not bring a civil action to enforce the law, because of the absence of a violation.
The commission could have revoked BFI's existing permit, but only upon a showing of cause. R.S. 30:1071. According to the commission's rules and regulations, a permit may be suspended or revoked for the following non-exclusive list of causes: violation of any term of the permit, the applicable rules and regulations, or the act; misrepresentation of any material fact in the permit application; willful failure to disclose all information requested in the permit application or upon information, including knowledgenot available at the time of the permit granting, which indicates that the operation poses a threat to human life or the environment; or any other cause, commission, or omission which is in violation of the regulations or the act. HWMP, Rule 5.2.8(A). Since there was no allegation of a violation, the suspension or revocation of the permit depended on a showing that there was a material misrepresentation on the permit application, which has not been alleged; or a showing that there had been an improper withholding of information on the application, which has not been alleged; or a finding that the operations under the permit posed a threat to human life or the environment. The last cause was the principal allegation of the citizens' group from Calcasieu Parish.
The stated purpose of the Hazardous Waste Control Law was to preserve the integrity of the environment and to protect the health and safety of the citizens of the state. R.S. 30:1132(A). The commission was given authority to promulgate rules and regulations and thereby effectuate the stated purpose of the act. R.S. 30:1136(A). The commission, unable to foresee every possible source of threat to the people or the environment, has included in its rules and regulations a general provision which allows the revocation of a permit whenever there is a threat to the environment or the health and safety of the people, even if the information or knowledge of the threat becomes known after the permitting process is completed. This is authorized by the statute by its general statement of purpose. Since any act or omission which causes such a threat is an act or omission in direct contravention of the rules, they are violations of the rules. The commission's rules have recognized the creation of such threats as violations, and provide that the procedures for a revocation of a permit for this cause are the same as those which must be followed for other violations. HWMP, Rule 5.2.8(B).
Since, as already stated, the commission found that there was no violation or charge of violation before it, the commission clearly was not proceeding to revoke the existing permit under which BFI was operating.
The commission, alternatively, could have acted upon BFI's pending application for a permit, and either granted it or denied it. This, however, clearly was not before the commission, as evidenced by both the notice of the meeting and the fact that BFI's application was undergoing modification.
The court of appeal was in error in finding that BFI was no longer operating under an existing permit. The commission correctly found, in its November order, that BFI was operating under an existing permit.
Section 1146 allows continued operations under an old permit "until the issuance or denial of a permit or license or the setting of a schedule of compliance of performance guidelines by the commission." (Emphasis added). Chairman Day considered § 1146 in the following presentation to the commission at its closing session.
"... I think that 1146 of the EnvironmentalSection 1146 of Title 30 of the Revised Statutes which deals with existing facilities gives the Commission broad authority and responsibility over existing facilities. The legislature, in drafting this provision, recognized that existing sites were going to create unique and different problems, and the Commission *1299 was charged with the responsibility of either granting or denying permits, or issuing compliance orders, or setting standards of performance. It is in the disjunctive `or', I think the Commission can issue today, a compliance order setting a date of closure of this facility." Transcript, vol. 11, at 32-33 (May 12, 1983).
This analysis by Chairman Day, which basically was followed by the court of appeal, is improper. As discussed in the opinion below, the compliance schedule, which is the specific device mentioned in § 1146, serves as a notice of change in the rules or statute, or notice of the invocation of special rules which became applicable due to changes in circumstances. Section 1146 gives authority to the commission to issue compliance schedules to existing permitted facilities in the same manner and for the same purpose as for newly permitted facilities. Section 1146 does not substantively expand the function of compliance schedules, as defined in § 1136(A)(4). The proper interpretation of § 1146 is that the commission may rule on a permit application, or, if the appropriate occasion arises, may issue a compliance schedule. Just as a newly permitted facility's permit continues in effect after the issuance of a compliance schedule, so, too, does the existing facility's permit continue in force, as modified by the compliance schedule. Both the court of appeal and the commission erred when they found § 1146 to mean that a compliance schedule could replace a permit.
Finally, the commission could have issued a compliance schedule. A compliance schedule, as authorized by the statute, may be issued "for the conformance of transportation equipment and treatment, storage and disposal facilities with the operating standards and rules and regulations of the commission." R.S. 30:1136(A)(4). It can be said, since this device is not an enforcement device to be exercised after there has been a finding of a violationsuch enforcement being specially authorized by § 1073(C)(2)-(3)this device is to be used whenever there is a new rule or regulation, a change in the statute, or the need to invoke a special rule as a result of a change in circumstances. The schedule serves as a notice of change, and is issued in order to give a hazardous waste handler a time frame within which his conduct must conform to the standards established in the rules and regulations. If no standards are established in the rules and regulations, then there is nothing with which to comply. None of this is to say that the commission could not, after the adoption of new rules, prohibit the handling of certain materials, and immediately order the cessation of their processing. The rules must be established first, and the compliance must follow.
The commission, by issuing its present compliance schedule, properly ordered the expanded monitoring of the site, since the rules allow for such monitoring, HWMP, Rule 5.5, and the need for such additional monitoring only recently arose. If new standards had been established, it was the commission's duty to inform BFI of those new standards, and then order BFI to comply within a specified time. If BFI did not comply within the allotted time, then BFI would have been in violation, subject to enforcement action. A review of the rules and regulations discloses no prohibition against the creation of the secure landfill cells which BFI seeks to fill, nor is there a prohibition against the use of such cells, or against their location at Willow Springs. Absent any such prohibition, and absent serious and imminent threat to the environment and health and safety, the commission cannot close down the site, except through a revocation proceeding, or through enforcement proceedings if there is a specific finding of a violation of some statute, rule, regulation or provision of some permit, order or schedule.
In light of the seriousness of the need to protect both the environment and the people from the possible devastating effects of hazardous waste contamination, as found by the legislature in its statement of purpose, this court could not allow the continuation of the operations of a polluting facility for the want of a strict adherence *1300 to procedures. While procedural rules are quite important, they should not be enforced at the cost of an environmental or health calamity. For that reason the record in this case, including transcripts of the testimony, the technical reports and other evidence has been examined to determine independently if there has been a violation of the rules and regulations, notwithstanding that the commission had not properly convoked a violation proceeding.
The record does not disclose evidence of a violation of any provision of the Environmental Affairs Act, or the rules and regulations promulgated thereunder. While there is evidence which shows contamination of the subsoils and first water bearing stratumthe fifty foot aquiferthere is no evidence either of a violation or imminent threat to health. This finding is supported by the statement of Gerald Healy, administrator of the Hazardous Waste Division of the Office of Environmental Affairs. Mr. Healy said, "I'm not absolutely sure at this point exactly what the data tells me and that's one of the problems that I have, but I do not see anything that tells me that we have an imminent immediate threat nor do I see any violation that I'm aware of on that site that would give us cause to begin enforcement action against that facility." Transcript, vol. 9, at 67 (May 2, 1983). The commission's counsel, Assistant Attorney General John Sheppard, also expressed doubts as to whether there actually was a violation of the Hazardous Waste Control Law, but nonetheless encouraged the commission to act.[3]
According to the manager of the nuclear project section of the Nuclear Energy Division of the Office of Environmental Affairs, there was no abnormal radioactive contamination of the site. Transcript, vol. 7, at 129 (Apr. 27, 1983). According to the Department of Conservation, there was no known leakage from the deep injection well. Transcript, vol. 7, at 162 (Apr. 17, 1983). According to Dr. Weir, a consultant hired by the department on behalf of the citizens' group, there were no present health hazards to the local residents. Transcript, vol. 6, at 16 (Apr. 26, 1983). The drinking water from the citizens' wells, tested on April 19, 1983 by the Department of Natural Resources, was safe. Id. at 51. The Department of Health and Human Resources also concluded, after testing in response to water quality complaints, that the local drinking water was safe and within EPA water quality standards. Transcript, vol. 3, at 102 (Mar. 15, 1983). The few contaminants that were found, were found in such minute quantities that their presence often was explained as resulting from sources outside of the site's activity, such as lab cleaners, air conditioning refrigerants and running gasoline motors. The evidence of migration of those contaminants is inconclusive.
The record does not support the commission's order closing the secure landfill cells. There is no proof in the record that there is a danger to the health and safety of the *1301 citizens or to the integrity of the environment from the continued operation of the landfill. There is no proof in the record that the current operation of BFI's landfill cells cause the health problems of which some witnesses complained. In fact, there is no proof that the current operations either caused or contributed to those contaminants which were found.
For the foregoing reasons, the judgment of the court of appeal is reversed and set aside, and ¶ X of the order of the Environmental Control Commission of May 12, 1983, which ordered the closure of the secure landfill cells at the BFI Willow Springs site by December 31, 1983, is vacated and nullified; respondent is cast for such costs of court as is permitted by law.
DENNIS, J., concurs in part and dissents in part for reasons assigned.
WATSON, J., dissents and assigns reasons.
LEMMON, J., dissents.
DENNIS, Justice, concurring in part and dissenting in part.
I respectfully concur in part and dissent in part.
This court is not an environmental control commission. Although there does not appear to be warrant in the record or a reasonable basis in law for the commission's order, it is not the proper place of this court to perform the commission's function by reviewing the evidence de novo, making findings of fact and issuing administrative orders. The proper disposition called for is vacation of the commission's order and a remand of the case in light of this court's interpretation of the legislated law.
WATSON, Justice, dissenting.
The majority errs in assuming that BFI had pre-existing "permits" to store hazardous wastes. Under the lax procedures in effect before passage of the Louisiana Environmental Affairs Act, BFI was operating a hazardous waste facility at Willow Springs, but it was doing so without a "standard permit". LSA-R.S. 30:1146 B. The fallacy of equating a letter of authority, issued in 1977 to BFI for "site development", with a permit results in the majority's erroneous conclusion that BFI has a licensed vested right to store hazardous wastes.[1] Under LSA-R.S. 30:1146 B, BFI's rights are very limited.
"B. A commercial hazardous waste treatment, storage, or disposal facility in existence and being operated on the effective date of the regulations promulgated pursuant to this Part and which is operating without a standard permit which intends to cease operations or withdraw its application for a standard operating permit shall notify the assistant secretary of such intention, shall submit a closure plan to the assistant secretary within ninety days of such notification, and shall be allowed to continue commercial operations for no longer than ninety days following such notification, unless the commission has determined that such facility satisfies all requirements of law and regulations for issuance of a standard operating permit. The commission may authorize an additional ninety days in which commercial operations may continue when the standard permit cannot be reasonably denied or issued within the original ninety days."[2]
BFI acknowledged it was operating without a standard permit when it applied for *1302 one on February 27, 1980. In February of 1983, BFI withdrew its application and submitted what amounted to a "closure plan" under LSA-R.S. 30:1146 B., estimating completion of its activities in two years. At that time, as the Court of Appeal correctly concluded: "BFI had neither a permit nor a pending application for one." 446 So.2d 755 at 759 (La.App. 1 Cir.1983). After extensive hearings, the commission issued a "Compliance Order and Schedule for Closure" which advanced BFI's closure date to December 31, 1983.
The majority fails to give any weight at all to the commission's action. The court of appeal correctly concluded "that the unanimous action of the Commission is supported by the record and is not arbitrary, capricious or manifestly erroneous." 446 So.2d 755 at 760 (La.App. 1 Cir.1983).
While it is impossible to summarize the mass of technical information presented to the commission, some of the evidence supporting its action is the following:
Expert Ellie Triegel confirmed that, on the eastern two-thirds of the site, the clays above the fifty foot pervious zone are generally contaminated. Cell number seven is in that area.
Dr. Henry B. Bradford, Jr., Director of the Division of Laboratories for the Office of Health Services and Environmental Quality, Department of Health and Human Resources, testified that BFI well number twenty had an "alarming level" of "gross beta activity of approximately 1,300 plus or minus 100 picocurie per liter."[3]
Dr. Frank Weir, an expert with a Ph.D. in comparative pharmacology and toxicology, who is an associate professor at the University of Texas School of Public Health, said chemicals are migrating from the BFI site, presenting a potential environmental problem. In testing bass and catfish from the area, there were significant findings with no plausible explanation other than chemical contamination. Weir said: "when you've got people that are reporting whelps on their skin, when you've got fish that will die, ... there is a different kind of responsibility."[4]
Dr. Paul Jones, a consulting hydrogeologist, has twenty-two years of experience with ground water conditions in Louisiana. According to Dr. Jones, there are two hydraulic interconnections on the site between the fifty foot pervious zone and the two hundred foot sand. BFI cell number eight is located over a point of interconnection between the fifty foot and two hundred foot zones. The cells are inevitably going to leak into the fifty foot pervious zone and then into the two hundred foot sand. Dr. Jones testified unequivocally that water will eventually move through the bottom of the pits or cells, and the cells will actually accelerate the rate of movement because it is impossible to backfill a cell to be as dense and impermeable as the material that was there initially. The next sand underlying the fifty foot zone is "the 200' Sand Sand of the Chicot Aquifer, which is the principal freshwater sand, drinking public supply aquifer that underlies a major portion of Calcasieu Parish."[5] Dr. Jones testified:
"Continuing to put hazardous waste in cell # 8 would be aan invitation, just an out right invitation to contamination of the 200' Sand."[6]
Dr. Jones expressed the same reservations with regard to cell number seven. Dr. Jones could not exclude contamination from the fifty foot pervious zone into Little River. Dr. Jones said the surface materials at the BFI site are not suitable for construction of a disposal facility for hazardous wastes. Dr. Jones expressed great concern about the integrity of clay liners. His testimony was corroborated by that of Vic Montelaro who was working for the Department of Natural Resources in the *1303 hazardous waste division during 1978 and 1979 and observed a blowout in the bottom of cell number six.
The evidence cited above cannot be reconciled with the majority's conclusion that there is no danger "... to the integrity of the environment from the continued operation of the landfill." The majority construes the Environmental Affairs Act strictly in favor of BFI instead of strictly for the health and safety of the public.
Despite the evidence of irreparable injury from BFI's continued operations, the majority has arbitrarily substituted its own judgment for that of the commission. LSA-R.S. 30:1147 A expressly prohibits the continuation of past methods of disposing of hazardous wastes:
"A. No person shall initiate or continue the generation, transportation, treatment, storage, or disposal of hazardous waste except as in compliance with the provisions of this Chapter."
The majority's result, a flagrant disregard of the legislature's intention in passing the environmental protection legislation, is a tragic continuation of BFI's poisonous practices.
I respectfully dissent.
NOTES
[1] The secure landfill cells are designed basically as follows. A five foot thick recompacted clay liner is placed along the bottom and sides of an excavated pit. The recompacted clay is to prevent any water which might have been present in the wastes from traveling outside of the cell. A leachate detection system is installed beneath the liner in order to detect any leakage from the cell. Above the liner is a leachate collection system to collect and pump out any liquids which form in the cell. Additionally, inside the cell, there are clay separators and barriers. When the cell is full, a three foot thick recompacted clay cap is placed on top of the cell. The cap is contoured to direct surface waters away from the cell. Finally, the cap is covered with topsoil and seeded with grass.
[2] The notice for the meeting stated:

"NOTICE
ENVIRONMENTAL CONTROL COMMISSION MEETING
In accordance with Section 2.5 of the Rules of Procedure, the Environmental Control Commission will hold a meeting on Monday, March 14, 1983, to consider the issuance of a compliance order for closure and cleanup of the landfill at the Browning-Ferris Industries' Willow Springs, Louisiana facility and any other compliance orders that may be necessary or appropriate for that facility...."
[3] "Mr. Sheppard:

The second point I'd like to make, and I apologize for going a little bit afield, but the second point I'd like to make in connection with the nakedness of our groundwater is this, Mr. Healy, at the last meeting took the position that nothing he had seen in connection with these hearings constituted a violation of any part of our Hazardous Waste Management Plan. In fact, contamination beneath the hazardous waste site did not, in fact, violate any provision or permit, compliance order, order, or any other provision which controls hazardous waste facilities in Louisiana.
I would hate to see our enforcement mechanism give up without a fight. I would hate for us to say that any contamination beneath an active site, which may arguably come from previous activities of the site, doesn't constitute a current violation which may trigger some enforcement kind of action on the part of the agency. I would think that if, in fact, we take the position that such contamination doesn't constitute a violation, we're leaving ourselves naked. I believe that puts us in the position of not being able to issue compliance orders for cleanup of existing sites because we can't show that any violation of the Hazardous Waste Management Plan exists. I think that the issue of contamination of groundwater, whether or not that constitutes a violation of anything, is an issue which has got to be confronted by somebody at some point or we in Louisiana are left absolutely vulnerable to sites in interim status leaking, which we may not have the power to do anything about." Transcript, vol. 11, at 25-26 (May 12, 1983).
[1] The letter in its entirety states:

"Review of the operational plan for referenced site development has been completed. The Office of Conservation has approved the application from a geological standpoint and the Police Jury of Calcasieu Parish has offered no objection. Accordingly, approval is given herewith.
"By direction of the State Health Officer.
 "Yours very truly,
 "G. Roy Hayes, Jr.,
 Administrator
 "Solid Waste and
 Vector Control Unit"

[2] Although not added by the legislature until 1983, the provisions of subsection B were declared remedial and made retroactive to January 1, 1980.
[3] Environmental Control Commission: Browning-Ferris Industries Closure Meeting, April 27, 1983, pp. 81 and 82.
[4] Browning-Ferris Industries Closure Meeting, April 26, 1983, page 87.
[5] Hearing of March 14, 1983, page 20.
[6] Environmental Control Commission: Browning-Ferris Industries Closure Meeting, April 27, 1983, page 41.